UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------X

RALPH L. BALLARD III, individually, and in
his capacity as Seller Representative under
a certain Purchase Agreement,

                    Plaintiff,                    06 Civ. 13099 (RWS)

        -against-                                 OPINION

PARKSTONE ENERGY, LLC, formerly known
as AMG ACQUISITION, LLC,

                    Defendant.

------------------------------------------------X

A P P E A R A N C E S:

        Attorneys for Plaintiff

        BROWN RUDNICK BERLACK ISRAELS LLP
        Seven Times Square
        New York, NY 10036
        By:  David J. Molton, Esq.
             Peter Adelman, Esq.

        Attorneys for Defendant

        FROST BROWN TODD LLC
        250 W. Main Street, Suite 2700
        Lexington, KY 40507
        By:  Denise H. McClelland, Esq.

        -and-

        Peter M. Levine, Esq.
        488 Madison Avenue, 19th Floor
        New York, NY 10022

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:

**Sweet, D.J.**

Plaintiff, Ralph L. Ballard, III ("Ballard" or the "Plaintiff") has moved under Rule 56, Fed. R. Civ. P. for summary judgment in the amount of $1,770,644.38 against defendant Parkstone Energy, LLC ("Parkstone" or the "Defendant"), which has also moved under the same rule for summary judgment against Ballard. For the reasons set forth below both motions are denied.

This litigation is the aftermath of a purchase agreement between the parties of October 5, 2005 under which Parkstone, then known as AMG Acquisition, LLC, bought for $42 million six companies in the business of operating coal mining washing and loading facilities and selling, marketing, and brokering coal products in West Virginia. The Agreement contained a holdback provision of $2 million to provide for an adjustment for a Closing Working Capital Statement. It is that adjustment which is the center of the parties' contentions. Despite the agreement of the parties that they are sophisticated and familiar with coal operations, there is sharp disagreement about the requirements and performance of the 48 page Purchase Agreement. Because of a simple dispute over a material fact, the authority of the president of Parkstone to submit a Closing Working Capital Statement on its behalf, both motions are denied.

1

The temptation to file a mercifully short opinion to that effect has been resisted in an effort to clarify the issues and in order to encourage the parties to reach a practical commercial resolution of their dispute rather than to continue the extensive litigation which has produced the current mountainous submission.

## Prior Proceedings

Ballard filed his complaint on November 9, 2006. Parkstone filed its answer and counterclaim on December 22, 2006. Ballard filed his amended complaint on January 24, 2007.

The instant motions were filed on March 2, 2007 and heard on April 18, 2007. No discovery has been cited in connection with the motions.

## The Facts

The facts are set forth in dueling Local Rule 56.1 Statements and Responding Statements and in certain affidavits. The facts are not in material dispute except as noted.

The facts as framed by the Parkstone submission follow.

3

On or about October 5, 2005, Parkstone (then known as AMG Acquisition, LLC), and Ballard, individually and in his capacity as the Seller Representative for Asset Management Group, Inc. ("AMG"), Asset Holdings, LLC ("Asset Holdings"), Asset Leasing, LLC ("Asset Leasing"), Asset Mining, LLC ("Asset Mining"), and other persons who owned Horizon Resources, LLC ("Horizon") and Siata Equipment Company ("Siata") (collectively the "Companies") executed the "Purchase Agreement Among The Interest Holders Set Forth On The Signature Pages Hereto and AMG Acquisition, LLC." (the "Purchase Agreement").

Section 2.5(a) of the Purchase Agreement identified the Companies as AMG, Asset Holdings, Asset Leasing, Asset Mining, Horizon and Siata.

The Purchase Agreement set the terms for Parkstone's acquisition of the Companies, providing for an adjustment of the purchase price after the Closing, based on changes in the Companies' Net Working Capital between the date of the Purchase Agreement and the Closing and as subsequently finalized.

"Net Working Capital" was defined in the Purchase Agreement as "the amount determined by subtracting Current

4

Liabilities, as of such date, from Current Assets as of such date, as prepared on the same basis as, and in accordance with, the calculations set forth on Schedule 2.5(a)."

The Purchase Agreement set the "Closing Consideration" at $45 million, with a payment of $43 million due and to be paid on November 21, 2005, the Closing Date. Although the Purchase Agreement stated otherwise, the parties agreed to reduce the Closing Consideration from $45 million to $42 million subject to a $2 million holdback.

The final Purchase Price could be less or more than $42 million, depending on adjustments to Net Working Capital made between the Pre-Closing Working Capital Statement, as of August 31, 2005 ("Pre-Closing Statement") and the final Closing Working Capital Statement. Pursuant to § 2.3 of the Purchase Agreement, Parkstone retained a holdback of $2 million (the "Holdback") pending the adjustments.

Under § 2.5(a) of the Purchase Agreement, the parties agreed that the Pre-Closing Statement, Schedule 2.5(a), set forth a calculation of the Net Working Capital of the Companies as of August 31, 2005.

5

Section 2.5(c) of the Purchase Agreement identified two
events for the completion of a Closing Working Capital Statement:
(1) closing the books and accounting records of the Companies as of
the Closing Date, i.e., November 21, 2005, and (2) completing a
physical inventory of the Companies' coal as of the Closing Date.

As to the first event, Section 2.5(c) states:

Cooperation. Without limiting the generality or effect
of any other provision hereof, the Sellers shall take
such actions as may be reasonably requested by the Buyer
to close, or to assist the Buyer in closing, as of the
Closing Date, the books and accounting records of the
Companies and otherwise reasonably cooperate with the
Buyer and the Buyer's Representatives in the preparation
of the Closing Working Capital Statement.

As to the second event, Section 2.5(c) states:

The Buyer and the Seller Representative shall cause a
physical inventory of the Companies' inventory to be
taken as of the Closing Date by an independent surveying
or engineering firm mutually agreeable to the Buyer and
the Seller Representative (the "Inventory Surveyor").
Such report shall be used to make any adjustments to
inventory in the calculation of the Closing Net Working
Capital.

The Purchase Agreement did not designate any deadline to
close the books and accounting records or complete the physical
inventory, nor did the Purchase Agreement contain any provision

6

that "time is of the essence" with respect to any event, including
the two events identified above.

Under Section 2.5(b) of the Purchase Agreement, the
parties agreed that, within sixty calendar days after the Closing
Date, Parkstone would deliver to Ballard a Closing Working Capital
Statement which "shall be prepared" as of the Closing Date on the
same basis as the Pre-Closing Statement. The Closing Working
Capital Statement also "shall" be accompanied by all worksheets and
data that support its calculations.

The parties agreed to use October 31, 2005 as the date
for calculating the Closing Working Capital Statement rather than
the actual Closing Date, November 21, 2005.

Net Working Capital, using the October 31, 2005 balance
sheets for the Companies, was over $1 million more than Net Working
Capital on the November 21, 2005 balance sheets for the Companies.
According to Ballard, a number of adjustments were made by
Parkstone during that period.

The sixty day deadline to prepare a Closing Working
Capital Statement would have expired on January 24, 2006.

Section 2.5(d) of the Purchase Agreement provides that, within 30 calendar days after delivery of any Closing Working Capital Statement, Ballard shall notify Parkstone of any disagreements with the Closing Working Capital Statement. If Ballard and Parkstone could not mutually agree on the Closing Working Capital Statement, then Parkstone and the Sellers, through the Seller Representative,

> shall select a nationally recognized independent accounting firm with no affiliation to the Buyer, the Companies or the Seller Representative and who is mutually satisfactory to the Buyer and the Seller Representative to resolve such dispute (the "Neutral Auditor") and shall submit in writing to the Neutral Auditor their respective positions with respect to the dispute items or amounts for purposes of calculating the Closing Net Working Capital.

Purchase Agreement § 2.5(d).

Only if the Sellers made an Adjustment Request within the prescribed thirty day period, and the parties used commercially reasonable efforts for an additional thirty calendar days thereafter to agree upon any adjustment to the Closing Working Capital Statement to no avail, were the parties then obligated to present their dispute to a neutral auditor.

In making the calculation for the Closing Net Working

8

Capital, the Neutral Auditor:

> shall be instructed to consider only those items or
> amounts in the computation of the Closing Working Capital
> Statement in dispute. The Neutral Auditor shall deliver
> to the Buyer and the Seller representative as promptly as
> possible, but in no event later than thirty (30) calendar
> days of its appointment, a report setting forth such
> calculation. Such report will be final, conclusive and
> binding on the parties.

Purchase Agreement § 2.5(d).

The Purchase Price is equal to the Closing Considerations
as adjusted by Net Working Capital according to § 2.5(e). If
current liabilities exceeded current assets, then the Purchase
Price was less than the Closing Consideration, and Parkstone was to
deduct the deficient amount from the Holdback and release the
remainder of the Holdback, if any, to the Sellers. If the Holdback
was not sufficient to pay the entire amount of the deficiency, the
Sellers were to promptly pay to Parkstone the balance of such
deficiency.

After the November 21, 2005 Closing Date, Parkstone's
accountants, Kelley Galloway & Company ("Kelley Galloway"), in
Ashland, Kentucky, requested from the Sellers and their accountants
assistance in connection with final adjusted balance sheets for the
Companies as of October 31, 2005 and November 21, 2005, in order to

9

finalize the Closing Working Capital Statement. The books and records of the Companies were in the exclusive custody and control of Parkstone on or about the Closing Date, and while Parkstone requested on a sporadic basis that the Sellers' accountants provide assistance to Parkstone's internal accountant, Parkstone did not request, nor did the Sellers' accountants provide, final adjusted balance sheets for the Companies as of October 31, 2005 and November 21, 2005.

By early January 2006, the Sellers had provided preliminary balance sheets for both October 31, 2005 and November 21, 2005.

According to her affidavit, on January 18-19, 2006, Emily Cox, of Kelley Galloway, completed reconciliation of the bank/cash accounts for the companies for the period beginning November 22, 2005 through December 31, 2005. In that bank reconciliation, Cox revealed a number of accounting errors for the October 31, 2005 and November 21, 2005 periods.

On February 10, 2006, the Sellers provided a different version of the balance sheets for October 31, 2005. Ballard disputes this fact.

There were $750,000 worth of changes to current assets and liabilities from the balance sheet received on December 28, 2005 to the balance sheet received on February 10, 2006. Ballard disputes this fact for lack of knowledge concerning the balance sheets. On March 9, 2006, Parkstone's accountants discovered another, newer version of the balance sheets for the Companies. The new balance sheet obtained on March 9, 2006 contained a decrease of approximately $25,000 in current liabilities as compared to the February 10, 2006 balance sheet. Ballard has no knowledge concerning these balance sheets.

In an e-mail to Parkstone's accountants on February 8, 2006, Steve Robey ("Robey"), the Sellers' accountant, stated that his

> crew indicates that it will have the books (immediately prior to Closing) adjusted/closed out and ready for my review over the next three days for Horizon, Siata, and Holdings. I will review their work and propose purchase adjustments shortly after their receipt. Leasing has been a challenge. We are having a difficult time getting anyone to verify/confirm note principal balances. AMG will be last in as much as it has all sorts of past-through impacts from its related entities. As Emily [Cox] can attest, the numbers keep moving. I realize everyone is eager for final numbers and am working towards that end.

> Cox. Aff. Ex. D.

11

According to Ballard, Robey's February 8, 2006 e-mail refers to encountering difficulty assisting Parkstone with allocating the Companies' purchase price for tax purposes because Parkstone's internal and/or external accountants were making frequent adjustments to the Companies' books and records, which were in Parkstone's exclusive custody and control on or after the Closing Date.

On February 15, 2006, Robey wrote Kelley Galloway and indicated that his firm had completed accounting issues for two of the Companies, was 95% done with a third and was still having difficulty with a fourth.

According to Parkstone, the Sellers' accountants continued to make adjustments to the financial statements and accounting records as of the Closing Date until at least late February 2006. According to Ballard, consistent with the Sellers' obligations under the Purchase Agreement, Robey produced the Purchase Price Allocation, and also produced tax returns for the Sellers, and to that end proposed to Parkstone's accountants certain adjustments to the Companies' books and records.

According to Parkstone, an inventory survey report was required to complete the Closing Working Capital Statement under §

12

2.5(c) of the Purchase Agreement.

A primary component of the inventory was a survey of the area where the surface (dirt/earth) was removed down to within twenty feet from the coal seams, known as "pre-stripped yards."

According to Parkstone, Ballard arranged for the initial inventory survey. According to Ballard, the parties jointly arranged for a physical survey of the Companies' inventory.

The parties agreed to conduct the aerial inspection for the inventory and the initial survey report on October 31, 2005. The aerial inspection report, not delivered to Parkstone until late December 2005, reflected total pre-stripped yards of approximately 2.8 million yards.

Parkstone's internal engineer, Jim Smith ("Smith"), reviewed the report and concluded that it ignored areas where coal had already been removed and thus overstated pre-stripped coal. He concluded that the actual total pre-stripped coal was approximately 1.7 million yards, not 2.8 million yards. Ballard has no knowledge concerning these conclusions, disputes that the initial survey "overstated pre-stripped coal," contends the initial survey fixed the volume of "overburden yardage" that had been worked as a part

13

of active mining operations as of October 31, 2005 by determining, through aerial photography, changes in the topography of the relevant areas, and contends that further engineering evaluation reflected how much of the overburden yardage still had its coal in place.

According to Parkstone, in mid January 2006, Shannon Keeran ("Keeran"), Chief Investment Officer and Secretary/Treasurer of Parkstone, told Ballard of Smith's findings and indicated that an outside independent engineer would review Ballard's report. Ballard agreed to the review by P&A Engineering Firm. According to Ballard, Smith informed Ballard that Keeran wanted to have an independent engineer confirm the volume of overburden yardage with coal still in place that the parties' initial survey and engineering review had determined had been worked in the active mining area as of October 31, 2005.

According to Parkstone, P&A Engineering Firm subsequently confirmed, and Ballard agreed, that the actual pre-stripped coal was 1,698,179 yards, or approximately half of the amount reported by the initial surveyor. According to Ballard, subsequent engineering review never purported to measure the volume of pre-stripped coal in the relevant area; it fixed the volume of overburden yardage with its underlying coal still in place that had

14

been moved as a part of active mining operations as of October 31, 2005.

On or about January 20, 2006, White delivered a Closing Working Capital Statement (the "Statement") to Ballard which Parkstone contends was a purported statement and which Ballard contends was the actual statement.

According to Parkstone, final agreement upon the physical inventory report did not conclude until late February 2006. According to Ballard, the results of the physical inventory report as it pertained to the Working Capital computation (the expense associated with overburden removal) remained unchanged from the Statement.

Section 2.6 of the Purchase Agreement required that the Sellers, prior to the Closing Date (November 21, 2005), prepare and deliver a schedule allocating the Purchase Price (and any other items). The Sellers delivered a preliminary oral Purchase Price allocation before the Closing Date. Ballard contends that because the Purchase Price Allocation is a function of the final Purchase Price, as adjusted after the Closing Date, it is only possible to deliver a preliminary Purchase Price Allocation on or before the Closing Date.

15

According to Parkstone, Ballard asked to revise the Purchase Price Allocation, even though the Purchase Agreement required that the Purchase Price Allocation be delivered at the Closing and Parkstone agreed to this modification of the Purchase Agreement. According to Ballard, the Sellers made adjustments as necessary to the Purchase Price Allocation, pursuant to their contractual obligations.

The Sellers did not deliver a final Purchase Price Allocation until March 1, 2006. The Sellers made millions of dollars of changes to the Purchase Price Allocation between the pre-Closing Purchase Price allocation and the post-Closing allocation. According to Parkstone, these changes benefited the Sellers, a contention Ballard disputes.

After the Closing Date, Parkstone retained certain of the Companies' employees, including Byrd White ("White"), who had been hired by Ballard in 2005, according to Parkstone, to help sell the Companies.

According to Parkstone, White reported to the authorized representative for Parkstone's owners. According to Ballard, he has no knowledge on which to base a belief about to whom White

16

reported.

As of the Closing, Parkstone designated Keeran as its Chief Investment Officer and Secretary Treasurer. According to Ballard, he has no knowledge on which to base a belief concerning the designation.

According to Parkstone, White had no authority to approve a Closing Working Capital Statement on behalf of Parkstone. Ballard disputes this contention.

According to Parkstone, Ballard knew that White, although named Parkstone's President, had limited authority. According to Ballard, he had no reason to doubt that White had full authority to tender the Closing Working Capital Statement on behalf of Parkstone.

According to Parkstone, Ballard knew that White was not authorized to approve a Closing Working Capital Statement for Parkstone. Ballard disputes this contention.

Before the Closing, Ballard negotiated the Purchase Agreement with Keeran and Kent Rowett ("Rowett"), purportedly the primary authorized representative of Parkstone's predecessor.

According to Ballard, both parties were sophisticated and advised by counsel. According to Parkstone, Ballard was also aware before and after the Closing that ultimate decision making authority for Parkstone rested with Michael Frey, ("Frey"), Chief Executive Officer of the general partners of Harrington Partners, L.P. and Merced Partners Limited Partnership, which own Parkstone. Ballard disputes this contention.

After the Closing, Ballard had at least two conversations with Rowett before January 20, 2006 regarding instances concerning White's role at Parkstone, including White's lack of a corner office and the absence of consultation with White on retaining an insurance broker for Parkstone. According to Ballard, this conversation did not give him knowledge that White had limited authority.

According to Parkstone, in the conversation about the corner office, Rowett told Ballard that White would be moved to a corner office, but that White was charged only with overseeing routine day-to-day operations. Ballard disputes this contention.

According to Parkstone, in another conversation, Ballard called Rowett to complain that Keeran should have consulted White before hiring the insurance broker for Parkstone. Rowett advised

18

Ballard that the decision was Keeran's. Ballard disputes this contention.

According to Parkstone, Ballard was told that White had to have Rowett and/or Keeran's approval for any significant issues. Ballard disputes this contention.

According to Parkstone, Ballard directly contacted White, rather than Frey, Rowett or Keeran, to request that White deliver to Ballard a Closing Working Capital Statement purportedly on behalf of Parkstone. Ballard disputes this contention and notes that delivery of a Closing Working Capital Statement was a contractual obligation of the Buyer under the Purchase Agreement that did not have to be requested by the Sellers.

Ballard discussed with White entries that he believed should be included on the Statement. Ballard notes that the Sellers were contractually obligated to reasonably cooperate with the Buyer in the preparation of the Closing Working Capital Statement.

According to Parkstone, White told Ballard the Statement had not been seen by, and therefore not approved by, Rowett and Keeran. According to Ballard, White told Ballard that Rowett and

Keeran had not seen the version of the Closing Working Capital Statement tendered on the Seller Representative by Parkstone on or about January 20, 2006.

According to Parkstone, the Statement was not prepared in the same manner as the Pre-Closing Working Capital Statement. According to Ballard, he has no knowledge on which to base a belief as to its form.

The Statement was not accompanied by the data and worksheets. According to Ballard, the data and worksheets were intended for the benefit of the Sellers in determining whether to make an Adjustment Request during the thirty day Adjustment Period, and Sellers' accountants obtained from the Buyer balance sheets and worksheets in support of the Statement and determined that it reasonably and accurately reflected the books and records of the Companies.

According to Parkstone, the Purchase Agreement required that data and worksheets documents "shall" be provided with the Closing Working Capital Statement. According to Ballard, Parkstone misreads the Purchase Agreement.

The Statement is attached to the Complaint and Amended

Complaint.

According to Parkstone, White left employment with Parkstone by mid-February 2006, less than ninety days after the Closing, while Ballard and Parkstone were still exchanging information about the preparation of a Closing Working Capital Statement. Ballard denies that he and Parkstone were still exchanging information in mid-February 2006 and asserts that Sellers exchanged information with Parkstone and its accountants in the course of settlement discussions concerning the release of the Holdback.

According to Parkstone, White never informed Rowett and Keeran that he had delivered the Purported Statement to Ballard. According to Ballard, he has no knowledge on which to base a belief as to whether Rowett and Keeran were informed.

According to Parkstone, after White had delivered the Statement to Ballard, numerous communications continued among Rowett, Keeran, Ballard, and their respective accountants for the purpose of obtaining the information to prepare a Closing Working Capital Statement. According to Parkstone, during those communications, Ballard and his accountants never indicated to any of Parkstone's authorized representatives that they had already

21

received a binding Closing Working Capital Statement. Ballard disputes this contention and asserts that following the tender by Parkstone of the Statement on or about January 20, 2006, the Sellers and/or their accountants communicated with Parkstone and/or its accountants when determining whether to make an Adjustment Request, and subsequently. Ballard further contends that evidence of the communications described by Parkstone is evidence of conduct or statements made in compromise negotiations regarding the release of the Holdback that is inadmissible under Fed. R. Evid. 408.

According to Parkstone, Ballard never issued any notice as required by § 2.5(d) of the Purchase Agreement concerning acceptance or objection to the Statement. Ballard disputes this contention and asserts that the terms of the Purchase Agreement only require delivery of an Adjustment Request if the Seller Representative wishes to notify the Buyer of a disagreement with its Closing Working Capital Statement, thereby making delivery of an Adjustment Request discretionary, and that the Purchase Agreement does not require Ballard to deliver any notice of "acceptance" of the Closing Working Capital Statement.

According to Parkstone, it first learned in early March that Ballard had received the Statement. Ballard disputes this contention and asserts that Parkstone learned that Ballard had

22

received the Statement upon the tender of it to Ballard by White.

According to Parkstone, Ballard never indicated he relied upon the Statement attached to his Complaint until the filing of his lawsuit. Ballard disputes this contention and asserts that he indicated his reliance on the Statement by attempting at times thereafter to collect sums due and owing under the Purchase Agreement, as fixed by the Statement and the absence of an Adjustment Request.

According to Parkstone, neither Ballard nor his agents even contended before threatening this lawsuit in August 2006 that the Statement was binding upon Parkstone. Ballard denies this contention and asserts he and/or his accountants indicated Ballard's belief that the Statement was binding on Parkstone by attempting at times thereafter to collect sums due and owing under the Purchase Agreement, as fixed by the Statement and the absence of an Adjustment Request, and that because the terms of the Purchase Agreement do not require that Seller Representative to contend that a Closing Working Capital Statement tendered by the Buyer is binding.

According to Parkstone, the Statement omits more than $650,000 of accounts payables owed to third parties shown on the

23

Companies' accounting records on October 31, 2005 and also on November 21, 2005 and these current liabilities reduce the Purchase Price by more than $650,000. According to Ballard, he has no knowledge on which to base a belief as to this contention.

The Statement removes the liability of $438,836.85 for an account payable arising from rent due for a high wall miner purchased and leased by Asset Leasing several months before the Closing Date.

The Companies' internal accounting records reflect that $438,836.85 in rent was owed by one of the Sellers (Asset Leasing) to an affiliate of Parkstone (Madison Equipment LLC) as of the Closing Date. The amount of $438,836.85 was shown as an accounts payable (or liability) on the Sellers' accounting records as of October 31, 2005. According to Parkstone, Ballard seeks to add this amount back into the Statement, when it should reduce the Purchase Price due to the Sellers. Ballard denies this contention and asserts Parkstone produced and bore final responsibility for the Statement tendered on the Seller Representative by Parkstone on or about January 20, 2006.

Parkstone disputes several entries on the Statement,

including the entries for "actual shot yards",[1] the BC Energy Advance, the DiVito workers' compensation deposit, the value of cost to move pre-stripped yards, pre-paid leases, and other matters. According to Ballard, he has no knowledge on which to base a belief as to these contentions.

The Sellers treated the BC Energy Advance as a long term asset instead of a current asset on the Companies' financial records.

According to Parkstone, the Statement overstates assets by at least $3 million and understates liabilities by at least $844,000 and would result in a substantially overstated Purchase Price. According to Ballard, the Sellers' accountants obtained from the Buyer balance sheets and worksheets in support of the Statement and determined that the Statement reasonably and accurately reflected the books and records of the Companies.

According to Parkstone, by late March 2006, the parties recognized that a dispute existed regarding the Statement. Ballard disputes this contention and asserts that by mid-March 2006, the

---

[1] The term "shot yards" refers to earth that has been blasted in preparation for earth removal.

Sellers recognized that the Buyer was unwilling to release the adjusted Holdback as fixed by the unchallenged Statement, the parties began settlement discussions concerning the release of the Holdback, and that evidence of the communications is evidence of conduct or statements made in compromise negotiations regarding the release of the Holdback that is inadmissible under Fed. R. Evid. 408.

According to Parkstone, as of early April 2006, the parties acknowledged, in writing, the existence of a dispute and agreed to waive any prior deadlines and continue negotiations toward a final Closing Working Capital Statement. On or about April 7, 2006, the parties entered into an agreement entitled "Agreement Concerning Settlement Discussions Regarding Claims Related To Breach of Purchase Agreement and Closing Working Capital Statement" (the "Settlement Discussion Agreement") that by its express terms related, inter alia, to settlement discussions concerning "alleged breaches of the Purchase Agreement." According to Parkstone, the Settlement Discussion Agreement evidenced the parties' ratification, not abandonment, of the terms of the Purchase Agreement and there was no waiver or modification of the Purchase Agreement's obligations by Ballard, written or oral. According to Ballard, evidence of any communications made pursuant to the Settlement Discussion Agreement is evidence of conduct or

statements made in compromise negotiations regarding the release of the Holdback that is inadmissible under Fed. R. Evid. 408.

According to Parkstone, the Settlement Discussion Agreement states: "The parties desire to meet for the purpose of discussing and resolving their disagreements concerning potential claims regarding . . . the Closing Working Capital Statement under the Purchase Agreement . . . and further agree that the Meetings will be held exclusively for settling any disputes in respect . . . of . . . the Closing Working Capital Statement."

According to Ballard, beginning in the middle of March, 2006, the Buyer provided the Sellers with spreadsheets purporting to revise the Net Working Capital Adjustment contained in the Statement, in the context of settlement discussions, the Sellers' accountants had numerous exchanges with Parkstone's accountants concerning the release of the Holdback, and evidence of the communication described in paragraph 82 of the 56.1 Statement is evidence of conduct or statements made in compromise negotiations regarding the release of the Holdback that is inadmissible under Fed. R. Evid. 408.

The negotiations continued until August 1, 2006, when they were unilaterally terminated by Ballard, individually and as

the Seller Representative. Ballard notes that he terminated the settlement discussions when it became obvious that further negotiations would be fruitless. He further contends that evidence of the communications described is evidence of conduct or statements made in compromise negotiations regarding the release of the Holdback that is inadmissible under Fed. R. Evid. 408.

Parkstone notified the Sellers, through Ballard, as the Seller Representative, that Parkstone was willing and able to recommend a nationally-recognized independent accounting firm and pursue the Neutral Auditor process under Section 2.5(d) of the Purchase Agreement.

According to Parkstone, Ballard does not own two of the Companies, Horizon and Siata. Ballard disputes this contention and asserts that he was assigned all title and interest in Horizon.

According to Parkstone, Ballard has not received any assignment of title and/or property interests to any judgment sought in this case from all of the owners of Horizon and/or Siata. Ballard disputes this contention and asserts that he was assigned all title and interest in Horizon.

According to Parkstone, the final consolidated balance

sheet for the Companies as of October 31, 2005 reflects that two of the Companies, Horizon and Siata, collectively held $34,847,115 in assets out of $110,311,856 in total assets for the Companies and Horizon and Siata collectively held $41,230,646 in liabilities out of $99,888,000 in total liabilities for the Companies and therefore held approximately 32% of the total assets and 42% of the total liabilities of the Companies as of October 31, 2005. According to Ballard, he has no knowledge upon which he can base a belief as to this contention.

The additional facts as framed by the Ballard motion follow.

According to Ballard, pursuant to § 10.1 of the Purchase Agreement, each of the Sellers appointed Ballard as its Seller Representative, as that term is defined in the Purchase Agreement. Parkstone contends that the Purchase Agreement does not assign to Ballard any legal interest in the recovery of the claims asserted by Ballard in his Complaint for at least two of the Companies, namely Horizon and Siata.

The parties to the Purchase Agreement agreed that the Purchase Agreement could not be amended or modified except through a specific, written agreement, and that a party could only waive

29

its rights under the Purchase Agreement through a written waiver. Parkstone contends that the parties agreed to certain modifications of the Purchase Agreement as allowed by law, including oral modification coupled with reliance and substantial performance.

The parties to the Purchase Agreement agreed that the Purchase Agreement, as written, constituted the entire and complete agreement of the parties. Parkstone contends that Ballard, as Seller Representative, and Parkstone agreed to several material modifications to the Purchase Agreement that are not set forth in formal written agreements and that Parkstone relied and performed based upon these modifications.

The parties to the Purchase Agreement agreed that the Buyer would retain a "Holdback," as that term is defined in the Purchase Agreement, of $2,000,000 from the Purchase Price pending the calculation of the Companies' Net Working Capital as of the date of closing, that Purchase Price would be adjusted, if necessary, after the calculation of a Closing Working Capital Statement, and that, after calculating of the Closing Working Capital Statement, if the Purchase Price was less than $42 million, the Buyer agreed to deduct the amount of that deficiency from the Holdback and release the remainder of the Holdback to the Sellers.

The parties to the Purchase Agreement agreed that the Buyer would produce and deliver to the Sellers a Closing Working Capital Statement setting forth the Companies' closing Net Working Capital, as that term is defined in the Purchase Agreement, within sixty calendar days of the Closing Date. Parkstone contends that the Statement would be delivered only if and when two conditions precedent specified in § 2.5(c) of the Purchase Agreement were completed, namely the closing of the accounting records and books of the Companies as of the Closing Date and October 31, 2005, and the completion of the Inventory Survey report, including its review by Parkstone. According to Ballard, the Purchase Agreement did not designate any deadline to close the books and accounting records or complete the physical inventory; nor did the Purchase Agreement contain any provision that "time is of the essence" with respect to any event.

The parties to the Purchase Agreement agreed that, absent a challenge by the Sellers to the Buyer's calculation of the closing Net Working Capital (the "Adjustment Request") within the thirty day Adjustment Period, the Closing Working Capital Statement delivered in accordance with § 2.5(b) would be binding on the parties. Parkstone denies that the Statement received by Ballard from White on or about January 20, 2006, was authorized, accurate, or issued pursuant to §§ 2.5(b), 2.5(c) or 2.5(d) of the Purchase

31

Agreement.

The parties to the Purchase Agreement agreed that, if the Sellers submitted an Adjustment Request during the Adjustment Period, the parties were obligated to use commercially reasonably efforts for an additional thirty calendar days to agree upon any adjustment to the Statement. According to Parkstone, it used, and it was led to believe that Ballard was using, commercially reasonable efforts to reach a mutual Statement through March 2006, prior to execution of their April 7, 2006 Settlement Discussion Agreement.

The parties to the Purchase Agreement agreed that, if after the thirty day period following submission of an Adjustment Request, the parties were still unable to agree upon a proposed adjustment, the parties would arbitrate the dispute.

On January 20, 2006, White, then President of AMG Acquisition, LLC (as reorganized as Parkstone), tendered to Ballard the Statement. According to Parkstone, the Statement is not a binding Closing Working Capital Statement, because it was not authorized and is inaccurate. According to Ballard, the Statement is a Closing Working Capital Statement.

The Buyer did not provide Ballard with any other Closing Working Capital Statement within the time period specified in § 2.5(d) of the Purchase Agreement apart from the Statement. According to Parkstone, the conditions precedent to delivery of a Closing Working Capital Statement were not completed until March 2006, when Parkstone delivered several Closing Working Capital Statements to Ballard's accountant.

The Statement reflects a negative working capital adjustment of $229,355.16.

Ballard, as Seller Representative, did not make a written Adjustment Request pursuant to § 2.5(d) of the Purchase Agreement during the thirty day period following tender of the Statement. According to Parkstone, Ballard did not challenge the Statement because he participated in its creation, requested it from White, knew it was inaccurate and not authorized, concealed its existence from Parkstone, did not rely upon it, and knew that the parties were negotiating a mutually agreeable Closing Working Capital Statement. Ballard denies this contention.

According to Ballard, in the absence of a written Adjustment Request, the Purchase Price was fixed at $41,770,644.84, of which $1,770,644.84 is due and owing to the Sellers. According

33

to Ballard, in the absence of a written Adjustment Request, the Statement became binding on the parties under the Purchase Agreement and Ballard made repeated requests to the Buyer for the release of the balance of the Holdback, contentions denied by Parkstone. According to Parkstone, the Statement is inaccurate by over $3,800,000 and is also unauthorized.

Parkstone to date has not released the balance of the Holdback to Ballard.

On April 7, 2006 the parties entered into the Settlement Discussion Agreement annexed to the Ballard Affidavit as Exhibit F. According to Parkstone, on August 1, 2006, the Settlement Discussion Agreement was terminated unilaterally by Ballard.

The Buyer was given custody of the Companies' books and records on or about the Closing Date, as that term is defined in the Purchase Agreement. According to Parkstone, it was not responsible for closing out the Companies' books and records and the Purchase Agreement at § 2.5(c) states that the "sellers shall take such actions as may be reasonably requested by the Buyer to close . . . the books and accounting records of the Companies . . . ." According to Ballard, the Sellers at all times complied with all of the relevant provisions of the Purchase Agreement, a

34

contention denied by Parkstone.

According to Ballard, the parties to the Purchase
Agreement never modified the Purchase Agreement in writing, a
contention denied by Parkstone.

According to Ballard, the Sellers at no time waived in
writing any of the protections granted to them under the Purchase
Agreement, a contention denied by Parkstone.

The parties to the Purchase Agreement agreed that all
court costs, attorney fees, and travel expenses incurred in
connection with any Proceeding, as that term is defined in the
Purchase Agreement, arising out of the Purchase Agreement would be
awarded to the party or parties substantially prevailing in the
Proceeding.

## The Summary Judgment Standard

In deciding a motion for summary judgment, a court shall
render judgment "forthwith if the pleadings, depositions, answers
to interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to a judgment

35

as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp.
v. Catrett, 477 U.S. 317, 322 (1986); Weinstock v. Columbia Univ.,
224 F.3d 33, 41 (2d Cir. 2000).

The moving party has the initial burden of showing that
there are no material facts in dispute, Adickes v. S.H. Kress &
Co., 398 U.S. 144, 157 (1970), and can discharge this burden by
demonstrating that there is an absence of evidence to support the
nonmoving party's case, Celotex, 477 U.S. at 325. The nonmoving
party then must come forward with "specific facts showing that
there is a genuine issue for trial," Fed. R. Civ. P. 56(e), as to
every element "essential to that party's case, and on which that
party will bear the burden of proof at trial." Celotex, 477 U.S.
at 322.

The court "must resolve all ambiguities and draw all
reasonable inferences in favor of the party defending against the
motion." Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1187 (2d Cir.
1987); see also Eastway Constr. Corp. v. New York, 762 F.2d 243,
249 (2d Cir. 1985). However, the court must inquire whether "there
is sufficient evidence favoring the nonmoving party for a jury to
return a verdict for that party." Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 249 (1986). If there is not, summary judgment is
proper. See id. at 249-50.

36

## Summary Judgment is Denied Because
## There is a Material Fact in Contention

The foregoing factual recitation demonstrates that factual contentions surrounding the Statement provided by White to Ballard are in direct conflict. According to Ballard, the Statement was authorized, and he properly relied upon it. According to Parkstone, it was unauthorized and Ballard knew it because he had been advised of White's limited authority. This direct conflict requires the denial of both motions for summary judgment.

Parkstone by its motion seeks appointment of the neutral arbitrator, but according to Ballard this provision was never triggered because he relied on the Closing Working Capital Statement.

The parties' rights must be determined initially by the terms of the Purchase Agreement, and not from extrinsic or parol evidence. See County of Suffolk v. Alcorn, 266 F.3d 131, 138 (2d Cir. 2001) ("Under New York law . . . if a contract is unambiguous on its face, the parties' rights under such a contract should be determined solely by the terms expressed in the instrument itself rather than from extrinsic evidence as to terms that were not expressed or judicial views as to what terms might be preferable")

983, 987-88 (2d Cir. 1991)).

Section 2.5 of the Purchase Agreement applies when (1) the Buyer tenders a Closing Working Capital Statement within the 60 days following the Closing Date, (2) the Sellers dispute it by delivering an Adjustment Request within the 30 days following delivery of the Closing Working Capital Statement, and (3) thirty additional days of commercially reasonable efforts to agree upon an adjustment prove unavailing. Purchase Agreement §§ 2.5(b), (d).

With the exception of a pre-Closing amendment changing the Closing Consideration from $45 million to $42 million, the Parties never amended, modified or supplemented § 2.5 of the Purchase Agreement by any writing.

Parkstone does not allege that the parties executed a written agreement referencing the Purchase Agreement that amended or modified the express deadlines and procedures but has suggested the parties previously orally modified the Purchase Agreement. There was, however, no oral modification made to the Purchase Agreement. The reduction in Closing Consideration is set forth (in writing, consistent with § 10.5 of the Purchase Agreement) in the November 18, 2005 amendment to the Purchase Agreement.

**Parkstone Has Not Established that the Purchase Agreement
Was Modified by the Parties' Conduct**

"[F]or a course of performance to demonstrate mutual
assent to a modification, it must be 'unequivocally referable' to
the modification." Dallas Aerospace, Inc. v. CIS Air Corp., 352
F.3d 775, 783 (2d Cir. 2003) (citations omitted). "Similarly, for
conduct to amount to a waiver or estoppel, it must not otherwise be
compatible with the agreement as written; rather, the conduct of
the parties must evidence an indisputable mutual departure from the
written agreement." Id. (citations, internal quotations and
brackets omitted).

The settlement negotiations resulted in the Settlement
Discussion Agreement, which stated that it dealt with "potential
claims regarding alleged breaches of the Purchase Agreement and the
Closing Working Capital Statement under the Purchase . . . ."

The parties' exchange of working capital calculations
following the January 20, 2006 Statement did not constitute a
course of conduct that modified the Purchase Agreement. The
Sellers entered into settlement discussions concerning the working
capital calculation, indicating the existence of a difference of
opinion between the parties as to the validity of the claim

39

existed. Although the Settlement Discussion Agreement was not executed until on or about April 7, 2006, the parties' dispute arose weeks earlier. See, e.g., Parkstone Rule 56.1 Statement ¶ 79 (parties had acknowledged dispute by "late March 2006"). In fact, a March 17, 2006 document created by Parkstone and titled "Working Capital Calculation Summary of Differences" expressly sets forth the differences between the Statement tendered on January 20, 2006, and a subsequent calculation performed by Parkstone's outside accountants. (Robey Aff. Ex. A.) This document demonstrates Parkstone's acknowledgment of the dispute by at least March 17, 2006.

Here, the course of conduct evidence is directly referable to the parties' undisputed settlement negotiations (as later memorialized in the Settlement Discussion Agreement). See, e.g., Art of War Music Publ'g. Inc. v. Andrews, No. 98 Civ. 6034, 2000 WL 245908, at *3 (S.D.N.Y. Mar. 3, 2000).

For a contract to be modified by a course of conduct, "any change in an existing contract must have a new consideration to support it." Estate of Anglin v. Estate of Kelley, 705 N.Y.S.2d 769, 772 (N.Y. App. Div. 2000) (collecting cases) (internal citations and quotation marks omitted). Parkstone has contended that there was consideration for the Sellers' purported waiver of

40

the sixty day deadline for delivering the Closing Working Capital
Statement, specifically, Parkstone's "forgiveness" of the Sellers'
"delay" in satisfying the conditions precedent.  (Parkstone Opp.
Mem. at 9).  There are no documents or authorities to support this
contention.

## Parkstone Has Not Established that Ballard Waived Provisions of the Purchase Agreement

Parkstone does not contend that Ballard waived in writing
the deadlines and procedures of § 2.5.  Parkstone has not
established that Ballard waived the deadlines and procedures of §
2.5 through a course of conduct.  "The intent to waive must be
unmistakably manifested, and is not to be inferred from a doubtful
or equivocal act." Ess & Vee Acoustical & Lathing Contractors, Inc.
v. Prato Verde, Inc., 702 N.Y.S.2d 38, 39 (N.Y. App. Div. 2000)
(quoting Orange Steel Erectors, Inc. v. Newburgh Steel Prods.,
Inc., 640 N.Y.S.2d 283, 285 (N.Y. App. Div. 1996)) (internal
quotation marks omitted).  Ballard made repeated demands for
release of the Holdback, and by entering into the Settlement
Discussion Agreement to facilitate negotiations concerning what the
Settlement Discussion Agreement explicitly describes as breaches of
the Purchase Agreement.

Evidence of the settlement discussions, even if

41

admissible, would not support a waiver of § 2.5's express deadlines
and requirements. See, e.g., Enter. Eng'g., Inc. v. Hartford Fire
Ins. Co., No. 04 Civ. 5018 (DLC), 2004 WL 2997857, at *3 (S.D.N.Y.
Dec. 23, 2004) (noting that pendency of settlement discussions are
not sufficient to support waiver of contractual deadline).

## Parkstone Has Not Established that Ballard Failed to Abide By the Terms of the Purchase Agreement

Parkstone also contends that Ballard's alleged failure to
perform excused Defendant from its obligations under the Purchase
Agreement. According to Parkstone, § 2.5(c)'s two requirements --
(1) conducting a physical inventory, and (2) providing the Buyer
access to books and records and assistance in aid of producing
Parkstone's Closing Working Capital Statement -- were "conditions
precedent," and Ballard failed to fulfill them, thereby relieving
Defendant of its obligation to deliver a Closing Working Capital
Statement within sixty days of the Closing Date.

A condition precedent is "an act or event, other than a
lapse of time, which, unless the condition is excused, must occur
before a duty to perform a promise in the agreement arises."
Catskill Dev., L.L.C. v. Park Place Entm't Corp., 154 F. Supp. 2d
696, 704 (S.D.N.Y. 2001) (quoting Oppenheimer & Co., Inc. v.
Oppenheim, Appel, Dixon & Co., Inc., 86 N.Y.2d 685, 691 (1995)). A

42

contract must "expressly provide[]" that a requirement is a condition precedent for it to be enforced as such. SCS Communs., Inc. v. Herrick Co., 360 F.3d 329, 341 (2d Cir. 2004).

Section 2.5(c) of the Purchase Agreement provides, in pertinent part:

Cooperation. Without limiting the generality or effect of any other provision hereof, the Sellers shall take such actions as may be reasonably requested by the Buyer to close, or to assist the Buyer in closing, as of the Closing Date, the books and accounting records of the Companies and otherwise reasonably cooperate with the Buyer and the Buyer's representatives in the preparation of the Closing Working Capital Statement. In connection with the preparation of the Closing Working Capital Statement, the Buyer and the Seller Representative shall cause a physical inventory of the Companies' inventory to be taken as of the Closing Date by an independent surveying or engineering firm mutually agreeable to the Buyer and the Seller Representative (the "Inventory Surveyor").

The Purchase Agreement does not explicitly describe the cooperation requirements as conditions precedent. Had the parties desired to include the cooperation requirements as conditions precedent, they could have included them in Article VII of the Purchase Agreement, entitled "Conditions to the Buyer's Obligations." See Christian Mut. Life Ins. Co. v. Penn Mut. Life Ins. Co., 163 F. Supp. 2d 260, 263 (S.D.N.Y. 2001).

The Sellers transferred custody of books and records to Buyer on or around Closing Date and provided Buyer assistance with producing Closing Working Capital Statement. See, e.g., Cox Aff. ¶ 6 (claiming receipt of inaccurate preliminary balance sheets, but failing to allege that Plaintiff was the source of them); ¶ 7 (discovering accounting errors but not attributing them to Sellers); ¶ 8 (suggesting that e-mail from Sellers' accountant acknowledged making constant changes in accounting entries); ¶ 9 (claiming receipt of modified balance sheet, but failing to allege that Plaintiff was the source of it); ¶ 14 (same); Robey Aff. ¶ 15 (confirming that Plaintiff was not the source of balance sheets Parkstone claims were constantly changing and/or erroneous); Robey Aff. Ex. B (December 2, 2005 e-mail from Parkstone accountant David Robinson acknowledging his updating consolidate balance sheet); Robey Aff. ¶ 14 (explaining that e-mail from Sellers' accountant was referring to Buyer's constant changes in accounting entries, not Sellers').

## The Arbitration Clause Was Not Triggered

In addition, § 2.5(d) of the Purchase Agreement sets forth the preconditions for arbitrating an adjustment to the Closing Working Capital Statement. In the event that (1) a Closing Working Capital Statement was delivered by the Buyer within the

prescribed sixty day period, and (2) the Sellers made an Adjustment
Request within the thirty day Adjustment Period, the parties were
obligated to use commercially reasonable efforts for an additional
thirty calendar days thereafter the agree upon any adjustment to
the Closing Working Capital Statement. If after those thirty days
the parties were still unable to agree upon a proposed adjustment,
only then were the parties obligated to arbitrate the dispute.
(Ex. A § 2.5(d)).

In the absence of an Adjustment Request by Ballard, an
authorized Closing Working Capital Statement was final and binding
under the express terms of § 2.5(d) of the Purchase Agreement.
Under the terms of the Purchase Agreement, the obligation to select
a neutral auditor never came about. See e.g., Primavera Labs.,
Inc. v. Avon Prods., Inc., 747 N.Y.S.2d 16, 17-18 (N.Y. App. Div.
2002) (holding that arbitration clauses, as contractual agreements,
must be enforced to their terms).

Regardless of whether the January 20, 2006 delivery of
Parkstone's Closing Working Capital Statement was unauthorized,
reference to the neutral auditor would be inappropriate under the
terms of the Purchase Agreement, because the conditions leading to
its neutral auditor provision were not triggered. See Seringer v.
Bd. of Trs. Of Vill. of Tuxedo Park, 697 N.Y.S.2d 124, 125 (N.Y.

45

App. Div. 1999) (holding that when fulfillment of contractual condition precedent is a "precondition to access to the arbitral forum" it is error to submit claims to arbitrator) (quoting County of Rockland v. Primiano Constr. Co., 51 N.Y.2d 1, 7 (1980)).

Parkstone's citation of Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79 (2002), is inapposite. In Howsam, the parties' contract (in contrast to the Purchase Agreement) had no triggering mechanism for sending a dispute to arbitration; rather, all disputes were automatically subject to arbitration. See 537 U.S. at 81; see also County of Rockland, 51 N.Y.2d at 5 ("It is for the courts to determine whether the parties agreed to submit their disputes to arbitration, if so, whether the particular dispute comes within the scope of their agreement, and finally whether there has been compliance with any condition precedent to access to the arbitration forum.").

## Ballard Has Standing to Bring This Action

Parkstone has argued that Ballard lacks standing to represent certain of the Companies in this action. However, as all of Companies executed the Purchase Agreement (which invested Ballard with authority as the Seller Representative), Ballard has standing to assert the Companies' claims. See, e.g., Oscar Gruss &

46

Son, Inc. v. Hollander, 337 F.3d 186, 191-94 (2d Cir. 2003).

**Conclusion**

For the reasons stated above, the motions of Ballard and Parkstone are denied.

It is so ordered.

**New York, NY**
**November 26 , 2007**

**ROBERT W. SWEET**
**U.S.D.J.**